UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 11-cr-68-EJL |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| OSCAR GARCIA, et al., | |
| Defendants. | |

## INTRODUCTION

The Court has before it several motions, many of which seek to dismiss the indictment. *See* Dkts. 223, 224, 225, 227, 230, 234, and 238. The Court has determined oral argument would not assist the decision-making process and will decide the motions without a hearing. For the reasons explained below, the Court will deny these motions.

## BACKGROUND

In March 2011, defendants Oscar Garcia and Juan Jimenez, along with nine others, were indicted for various crimes related to their association with a street gang known as *Brown Magic Clica,* or BMC. The other defendants have pled guilty; Garcia and Jimenez are the only defendants who will proceed to trial.

Both Garcia and Jimenez are named in Count One, which charges conspiracy – under 18 U.S.C. § 1962(d) – to violate the federal racketeering statute, 18 U.S.C. § 1962(c). Additionally, Counts Four, Five, and Six charge Garcia with murder and attempted murder in violation of 18 U.S.C. § 1959 – the federal statute on violent crimes in aid of racketeering activity (VICAR). Both defendants contend that the indictment fails to adequately state a RICO conspiracy offense. Garcia also contends that the indictment fails to adequately allege the VICAR offenses. These and other arguments are made in seven separate motions, which the Court will address in turn.

## ANALYSIS

### 1.      Garcia's Motion to Dismiss Count One (Dkt. 223)

In his first motion to dismiss (which Jimenez joined), Garcia argues that Count One fails to satisfy pleading requirements because it does not allege that (1) he agreed to further or facilitate an enterprise's alleged criminal endeavor, (2) he was aware of the nature and scope of the enterprise, or (3) his acts are "linked in any way" to the alleged enterprise's "plans or directives." Before addressing these arguments, the Court will summarize the relevant parts of the indictment.

#### A.      The Indictment

The indictment's conspiracy allegations can be divided into three basic parts: (1) allegations regarding the alleged RICO enterprise, including its history and purposes; (2) allegations that ten individuals, including Garcia and Jimenez, conspired to operate the enterprise through a pattern of racketeering acts; and (3) a list of specific overt acts.

### 1) BMC's History and Purpose

Paragraphs 1 through 13 of the indictment allege numerous specific facts about the formation and history of the street gang *Brown Magic Clica*, or BMC, which is the alleged RICO enterprise. *See Indictment* ¶¶ 1-13. According to the government:

Alfredo Castro and three others formed BMC in Nyssa, Oregon in the early 1990s. BMC is aligned with the national Sureno gang and, ultimately, the Mexican Mafia. BMC's colors are blue and brown and the gang often identifies itself with the number 13. BMC has existed continuously since its inception and its purposes include:

(1) preserving and protecting the gang's "power, territory, and profits" from rival gangs through violence and threats of violence;

(2) instilling fear in BMC's victims and potential victims through violence and threats of violence;

(3) financially supporting and "providing assistance" to BMC members, including members in prison;

(4) "assisting" gang members who commit crimes, including by hindering law enforcement from identifying, arresting, trying, or punishing them.

*Id.* ¶ 13.

BMC frequently conducts monthly meetings, or juntas, typically on the 13th of the month "to discuss gang business, collect gang dues, and administer discipline to members." *Id.* ¶ 8. Each member is expected to have a "hustle" – some form of criminal activity that yields money – and pay a percentage of the hustle (often 13%) to the gang as "'barrio money.'" *Id.*

The government also alleges that BMC members "frequently engaged in criminal activity, including, but not limited to, murders, assaults, intimidating witnesses, and the sale of controlled substances, firearms, and stolen property." In fact, "BMC members were required to commit acts of violence to maintain membership and discipline within the gang and against rival gangs." *Id.* ¶ 7.

### 2) Defendants' Agreement to Join the Conspiracy

After laying out this information about BMC, the indictment alleges that Garcia, Jimenez and eight others conspired to operate BMC through a pattern of racketeering activity. Specifically, paragraph 15 alleges that Garcia, Jimenez, and the others were "employed by and associated with BMC" and "knowingly and intentionally conspire[d] to violate 18 U.S.C. § 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering . . . which pattern . . . consisted of multiple acts involving" among other things, murder, attempted murder, arson, tampering and interfering with witnesses, and drug dealing. *Indictment* ¶ 15. Paragraph 15 also alleges that as part of the conspiracy, "each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise." *Id*.

Paragraphs 16 through 19 specify additional "parts of the conspiracy." Among other things, the government alleges Garcia and the others agreed BMC members and associate would:

(1)       commit crimes, including murders, assaults, witness intimidation, distribution of controlled substances, and sale of firearms and stolen property;

(2)       commit violent acts, including murder, attempted murder, and assault of rival gang members;

(3)       contribute a portion of financial gain from crimes to BMC;

(4)       cover up their crimes (including by threatening witnesses);

(5)       notify each other of gang members who were arrested or incarcerated;

(6)       share identities of individuals who may be cooperating with law enforcement and propose actions against them;

(7)       purchase, maintain, and circulate a collection of firearms for use in criminal activity; and

(8)       discipline BMC members and associates as necessary to promote a climate of fear and to enforce BMC's authority.

¶¶ 16-19.

### 3)    **Overt Acts**

Finally, in paragraph 20 (which has 71 sub-paragraphs and is about 15 pages long), the government alleges a host of specific "overt acts." Within paragraph 20, the government alleges that in July 2006, Garcia, Jimenez, and one other co-defendant shot at rival gang members I.C.'s house, "striking C.C. with a bullet." ¶ 20(g). The government also alleges that in August 2008, Garcia and another co-defendant shot at fellow gang members R.M. and G.M., killing R.M. and injuring G.M. ¶ 20(q).

### B. The Indictment Sufficiently Alleges a RICO Conspiracy

#### 1) Defendants' Agreement to Conspire

Garcia and Jimenez's first two arguments – that the indictment does not adequately allege they agreed to the conspiracy, or that they were aware of the enterprise's nature and scope – are focused primarily on paragraphs 15 through 19 of the indictment. Defendants assert that these "generic allegations as to a group of eleven defendants[1] as a whole provide insufficient factual allegations to furnish Mr. Garcia [and Mr. Jimenez] with notice of the charges against [them] and sufficient opportunity to prepare a defense." *Reply*, Dkt. 270, at 6.

The Court disagrees. Generally, a criminal indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. (c)(1). Failure to recite an essential element of the offense charged "is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment." *United States v. Pernillo-Feuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (citation omitted).

To adequately list the elements of RICO conspiracy, "an indictment need only charge – after identifying a proper enterprise and the defendant's association with that enterprise – that the defendant knowingly joined a conspiracy the objective of which was to operate that enterprise through an identified pattern of racketeering activity." *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991); *see also* 18 U.S.C. § 1962(d); *United*

---

[1] There are eleven defendants, but only ten are named in count one.

*States v. Tille,* 729 F.2d 615, 619 (9th Cir. 1984) ("Proof of an agreement, the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of section 1962(d).") The indictment need not allege overt acts, nor predicate acts that the defendant agreed personally to commit." *Glecier,* 923 F.2d at 500.

The indictment satisfies these standards. It adequately alleges the elements of a RICO conspiracy offense and provides sufficient factual information to notify Garcia and Jimenez of the charges again them and allow them to prepare a defense. Defendants' insistence that more specificity is required is unwarranted; the indictment sufficiently "descend[s] to particulars." *See Russell v. United States*, 369 U.S. 749 (1962) (quoting *United States v. Cruikshank*, 92 U.S. 542, 588 (1875)).

As detailed above, the indictment, in paragraphs 1 through 19, the government alleges that: (1) the BMC enterprise exists; (2) BMC is an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving BMC's objectives; (2) Garcia and Jimenez are "employed by and associated with" BMC; (4) Garcia and Jimenez knowingly and intentionally conspired to conduct BMC's affairs through a pattern of racketeering activity; and (5) Garcia, Jimenez, and the other conspirators agreed that each conspirator would "commit at least two acts of racketeering activity" in conducting BMC's affairs. *Indictment* ¶¶ 12, 15. These allegations, particularly when viewed in context of the indictment's specific factual allegations, sufficiently allege that Garcia and Jimenez were aware of the essential nature and scope

of the enterprise, and that they conspired to conduct BMC's affairs through a pattern of racketeering activity. *Accord United States v. Diaz,* 2006 WL 1833193 (N.D. Cal. 2006) (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000)).

Further, although not required to do so, the government has alleged numerous overt acts in paragraph 20 of the indictment. These allegations circumstantially show Garcia's and Jimenez's awareness of BMC's essential nature and scope and their agreement to join the conspiracy. Paragraph 20 also links Garcia's and Jimenez's actions to the overall goals of the enterprise and to acts taken by other BMC members. Defendants dispute this, contending that paragraph 20 is just a "string of alleged events, ordered by nothing more than chronology, . . . ." *Mot. Mem.*, Dkt. 223-1, at 4.

But, just to take one example, paragraph 20 alleges that in July 2006, Garcia, Jimenez, and one other gang member (Jessie Rodriguez) shot at a rival gang member I.C.'s home, "striking C.C. with a bullet." *Indictment* ¶ 20(g). This alleged shooting is connected to the underlying goals of the enterprise, and to the other overt acts. One of BMC's alleged purposes is to commit violent acts against rival gang members. Further, the government alleges several other incidences where BMC members shot at rival gang members or their homes or cars, or got into fights with rival gang members, including one incident where Jimenez allegedly stabbed someone. *See* ¶ 20(a), (b)[2] (d-f), (j), (m), (pp); *see also* ¶ 20(sss). In fact, Jimenez, allegedly fired shots at I.C.'s house in January

---

[2] Paragraph 20(b) alleges that three defendants, including Jimenez, shot at a vehicle they thought contained a rival gang member although, as it turns out, the person in the car was just delivering newspapers.

2006 as well. ¶ 20(a).  So Garcia's and Jimenez's alleged shooting at a rival gang member's home in July 2006 appears to be connected to one of BMC's goals and related to other acts alleged in paragraph 20.

Garcia also argues that his alleged role in a second shooting – at alleged fellow gang members R.M. and G.M. – "likely signifies a completely independent act that is disconnected from any conspiracy." *Mot. Mem.*, Dkt. 223-1, at 13.  Here, Garcia concedes that the indictment states BMC members discipline other members, but argues that "the shooting of R.M. does not give rise to the inference that Mr. Garcia was disciplining a BMC member because, later in the indictment, the government alleges that BMC members (not including Mr. Garcia) held a meeting and then 'visited the Hilltop Cemetery in Nyssa to visit the grave of deceased BMC member R.M.'" *Id.* at 13-14 (citing *Indictment* ¶ 20(ss)).

The gravesite visit does not, standing alone, give rise to an inference that Garcia was disciplining a gang member.  But it does not rule it out.  It is plausible that R.M.'s killing was gang-related *and* that some members visited his grave.  This more damaging inference is supported by other allegations.

Specifically, the government alleges that roughly two months after the shooting, co-defendant and fellow gang member Adelaido Gomez ordered the "intimidation, assault, and/or murder" of M.V. because she had cooperated with the investigation of Amando Torres-Garcia and Oscar Garcia for murdering R.M. and attempting to murder G.M.  *See* ¶ 20(x).  Also, Gomez wrote to Garcia, discussing "who had cooperated with

law enforcement in the murder case against Garcia and the efforts Gomez had make to influence and intimidate one witness." ¶ 20(xx). Garcia wrote back, "describing" R.M.'s murder and G.M.'s assault "and discussing the location of an incarcerated member of a rival gang." ¶ 20(jjj). Further, when Gomez ordered M.V.'s intimidation, assault or murder, he ordered the same treatment for "BMC member A.L. as retaliation for his testimony in the murder trial of BMC member H.A." *Indictment* ¶ 20(x).

Given these allegations, it is reasonable to infer that Garcia's alleged role in the shooting of R.M. and G.M. was intended to further the conspiracy and was animated by the goals of the alleged enterprise. The Court therefore rejects Garcia's argument that his alleged actions are not linked to BMC's plans or directives.

### 2) Pattern of Racketeering Activity

Likewise, the Court is not persuaded by defendants' relatedness and continuity arguments.[3] These arguments stem from the government's obligation to allege that the defendants agreed to conduct BMC's affairs through a pattern of racketeering activity. The relatedness and continuity requirements are part of the "pattern" requirement; the point is to prevent RICO from applying to "isolated" or "sporadic" criminal acts. *See, e.g., United Energy Owners Comm., Inc. v. United States,* 837 F.2d 356, 360 (9th Cir.

---

[3] In a separately filed motion to dismiss, Amando Torres-Garcia advances a related argument – that "the government has failed to allege a pattern of racketeering activity because the alleged racketeering acts, on their face, lack the 'relatedness' required to establish a RICO pattern . . . ." *Mot. Mem.,* Dkt. 231, at 12. Garcia and Jimenez joined this motion. *See* Dkts. 235, 241. The Court is not persuaded by Torres-Garcia's argument for the same reasons it is not persuaded by Garcia's related argument, as discussed in this section.

1988); *United States v. Diaz*, 176 F. F3d 52, 93 (2d Cir. 1999).

Preliminarily, the parties agree that the government does not need to allege continuity and relatedness as separate elements. Nonetheless, a RICO indictment must allege facts sufficient to show that predicate acts are related and pose a threat of continued criminal activity. *See H.J. Inc. v. Northwestern Bell Telephone,* 492 U.S. 229 (1989).

The government must therefore allege facts sufficient to show that the defendants agreed to operate BMC though racketeering acts that were both "continuous" and "related." Relatedness may be established by showing that the predicate acts have "'the same or similar purposes, results, participants, victims, or methods of commission.'" *Id.* at 240. The continuity prong of a RICO pattern "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. The continuity requirement may be satisfied by "a series of related predicates extending over a substantial period of time [closed-ended continuity]," or "past conduct that by its nature projects into the future with a threat of repetition [open-ended continuity]." *Id.* at 241, 242.

This indictment alleges facts sufficient to show both relatedness and continuity. According to the indictment, BMC rules required members to commit a variety of different crimes for different reasons. Thus, it is reasonable to infer that two otherwise disconnected acts – a shooting and a drug sale, for example – are related by virtue of the

fact that they were to be committed by BMC members to further BMC's goals of (1) committing acts of violence against rival gang members and (2) making money for the gang through hustles. "Separately performed, functionally diverse, and directly unrelated predicate acts and offenses will form a pattern under RICO, as long as they all have been undertaken in furtherance of one or another varied purposes of a common organized crime enterprise." *United States v. Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991).

As for continuity, where "the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." *Diaz*, 176 F.3d at 93. The government alleges that the BMC enterprise exists solely to commit racketeering acts and crimes; thus the indictment alleges facts sufficient to establish a threat of continued racketeering activity.

The indictment also alleges close-ended continuity by alleging a series of related predicate acts extending over roughly four years. Garcia points out that there are gaps within this period of time, but viewing the indictment as a whole, the Court finds it reasonable to infer that the conspiracy continued throughout this time period despite some periods of relative quiet. Moreover, "aside from the statutory requirement that at least two predicate acts occur within a ten-year period, there is no limit on the amount of time that can lapse between two predicate incidents." *United States v. Cooper* 91 F. Supp. 2d 60, 76 n.17 (D.D.C. 2000) (indictment sufficient despite three-year lapse between one alleged murder and robber and the other charged acts); *see also United States v. Wong*, 40 F.3d 1347, 1374–1375 (2d Cir. 1994) (upholding finding of a RICO

pattern of activity on three predicate acts occurring in February 1987, January 1990 and August 1990).

### 3) **Duplicitous Indictment**[4]

As an offshoot to their "relatedness" and "continuity" arguments, defendants argue that the indictment is duplicitous. Duplicity is the improper joining of two or more distinct and separate offenses within a single count. *See generally United States v. Renteria*, 557 F.3d 1003, 1007 (9th Cir. 2009).

Defendants argue that the conspiracy count does not charge a single offense, but instead charges a series of unrelated crimes. This argument fails because the Court has concluded that the government sufficiently alleged that defendants agreed to conduct BMC's affairs through a pattern of racketeering activity. True, the indictment refers to several different agreed-upon acts – murder, attempted murder, and arson, to name a few – but these all fall under the umbrella of a larger, properly charged RICO conspiracy. "Courts have repeatedly recognized that schemes that might ordinarily constitute different criminal conspiracies are properly joined in a RICO enterprise offense, provided those schemes are sufficiently 'related' under the statute." *United States v. Ali,* No. 04-CR-611-2, 2005 WL 2989728, at *1 (E.D. Pa. Aug. 19, 2005) (citing, among other cases, *United States v. Eufrasio,* 935 F.2d 553, 564-67 (3d Cir. 1991)). Additionally, defendants will be held liable for all acts of their co-conspirators, regardless of whether

---

[4] Garcia and Jimenez advanced this argument by joining Torres-Garcia's motion to dismiss, *see Mot. Mem.*, Dkt. 231, at 16. Torres-Garcia's motion is discussed below, in Paragraph 2. Logically, however, it makes more sense to discuss the duplicity argument here, alongside the "relatedness" and "continuity" points just discussed.

they specifically agreed to every aspect of the conspiracy. *See, e.g., Salinas v. United States*, 522 U.S. 52, 63 (1997). Defendants' argument that the indictment is duplicitous thus fails.

**2.      Torres-Garcia's Motion to Dismiss (Dkt. 230)**

Garcia and Jimenez next argue that the government failed to plead the existence of a RICO enterprise in the first place.[5] An enterprise is defined in 18 U.S.C. § 1961(4) to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See also* 18 U.S.C. § 1959(b). In light of these statutory features, the Supreme Court has explained that "'an enterprise includes any union or group of individuals associated in fact'" and that RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States,* 556 U.S. 938, 944 (2009) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Such an enterprise, the Court explained, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583.

Defendants do not focus on any facet of the statutory definition. Instead, they say that an enterprise cannot be properly identified unless the government also alleges at least two predicate acts that "give rise to" the enterprise. In other words, defendants are

_____

[5] Co-defendant Amando Torres-Garcia made this argument in his motion to dismiss (Dkt. 230), which defendants Garcia and Jimenez joined (Dkts. 235, 241). The motion is moot with respect to Torres-Garcia..

arguing that the existence of an enterprise cannot be proved without underlying racketeering activity. The Supreme Court, however, has explained that the existence of an enterprise "is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle,* 556 U.S. at 938 (citing *Turkette,* 452 U.S. at 583). Put differently, the "'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458 (S.D.N.Y. 2009).

When the enterprise element is properly understood, the indictment is sufficient on this point. It alleges that BMC is an association-in-fact enterprise that constitutes "an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise." *Indictment* ¶ 12. The indictment also provides information regarding BMC's origins, purposes, criminal activities, rules, methods of enforcing rules, meetings, and communication methods, among other things. *Id.* ¶¶ 2-11, 13.

**3. Garcia's Motion to Dismiss Counts One, Four, Five and Six Based on the Failure to Allege Elements of State Law Predicate Offenses (Dkt. 224)**

In his next motion to dismiss, Garcia argues that Counts One, Four, Five and Six should be dismissed because they do not specifically allege the elements of the state-law predicate acts underlying these counts. Again, Count One is the RICO conspiracy charge. Counts Four, Five, and Six charge Garcia with murder and attempted murder in violation of 18 U.S.C. § 1959 – the federal statute on violent crimes in aid of racketeering

activity (VICAR).  The Court will address the VICAR charges first, then the conspiracy charge.

### A.     The VICAR Counts

Counts Four, Five, and Six, charge Garcia with "status" crimes under the federal VICAR statute, which means he allegedly committed violent crimes (murder and attempted murder) for the purpose of achieving, maintaining, or increasing his status in the BMC enterprise.  *See generally United States v. Fernandez,* 388 F.3d 1199, 1232 (9th Cir. 2004).  The portion of the federal VICAR statute dealing with status crimes provides:

> Whoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished . . . .

18 U.S.C. § 1959(a).

Based on this statute, the Ninth Circuit has identified four elements of a VICAR status crime:  "'(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed a violent crime; and (4) that they acted for the purpose of promoting their position in the racketeering enterprise.'" *Fernandez,* 388 F.3d at 1220 (citations omitted).

Garcia argues that laying out these four elements is not enough.  He says the government must also specify each element of the state-law violent crimes Garcia allegedly committed.  As Garcia puts it, "the Indictment fails to provide even a modicum

of information about these alleged offenses (the murder and attempted murders), such as the circumstances surrounding them, Mr. Garcia's alleged role, or whether Mr. Garcia possessed the requisite *mens rea.*" *Mot. Mem.*, Dkt. 224-1, at 9.

Garcia has not cited any binding authority holding that a sufficient VICAR indictment must additionally set forth all elements underlying violent crime. To the contrary, most courts addressing the question have concluded that a more generic description in the indictment is sufficient – notwithstanding that the elements of the predicate acts must be proved at trial.[6] *See United States v. Carrillo*, 229 F.3d 177, 183 (2d Cir. 2000); *United States v. Martinez,* 136 F.3d 972, 978 (4th Cir. 1998) (indictment charging a VICAR offense need not even identify the specific state statute that serves as the predicate offense).

Moreover, in *United States v. Fernandez,* 388 F.3d 1199 (9th Cir. 2009), the Ninth Circuit held that an indictment charging a VICAR violation was sufficient when it alleged the four elements of a VICAR violation. *Id.* at 1220. *Fernandez* did not directly address the issue of whether a VICAR indictment must specify each element of the state-law offense. But it rejected defendants' argument that the indictment was insufficient because it did not adequately allege motive and intent relative to a violent crime underlying a VICAR charge. *Id.* at 1219-20. Here, the indictment alleges all elements of a VICAR status crime and each VICAR count identifies the underlying state-law offenses by citing to state-law code sections.

---

[6] The government agrees that "the court should instruct the jury on the elements of the state law offenses charged in the Indictment." *Response,* Dkt. 257, at 22.

### B.     The Conspiracy Count

Count One – the conspiracy count – is also sufficiently alleged without detailing the state-law elements of the overt acts Garcia allegedly committed.  Garcia concedes that the government is not required to allege any overt acts at all.  *See, e.g., Fernandez,* 388 F.3d at 1230 (citing *Salinas v. United States*, 522 U.S. 52 64-65 (1997)).  Rather, as noted above, an indictment alleging a RICO conspiracy need only identify (1) a proper enterprise; (2) the defendant's association with that enterprise; and (3) that the defendant knowingly joined a conspiracy, the object of which was to operate the enterprise through a pattern of racketeering activity.  *See, e.g., Tille,* 729 F.2d 614.  Despite this, Garcia's theory is that "since the government *chose* to allege several overt acts against Mr. Garcia . . . the government should be required to provide adequate notice and opportunity to respond to those weighty allegations."  *Mot. Mem.*, Dkt. 224-1, at 10.  The Court is not convinced that the indictment needs to do more.  It specifically informs Garcia of the dates he allegedly murdered, or attempted to murder, the victims (identified by initials), and the general circumstances surrounding those events.  It also specifies the state-law code sections Garcia allegedly violated. The Court therefore denies the motion to dismiss the VICAR counts against Garcia.

### C.     Notice of Special Sentencing Factors

Within this same motion, Garcia attacks the indictment's Notice of Special Sentencing Factors relative to RICO conspiracy count.  The notice provides:  "On or about August 23, 2008, the defendants OSCAR GARCIA . . . and AMANDO

TORRES . . . without justification or excuse, knowingly and intentionally caused the death of R.M., in violation of Oregon Revised Statutes, §§ 163.116 (murder), 163.005 (criminal homicide), and 161.155 (criminal liability)." *Indictment,* at 26.

Garcia says this notice violates his rights under *United States v. Apprendi*, 530 U.S. 466, 490 (2000). *Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt." *Id.*

The prescribed statutory maximum sentence for a violation of § 1962 is "not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)." 18 U.S.C. § 1963(a). The special sentencing factor explicitly charges a racketeering activity, i.e., murder under Oregon state law, which provides for a maximum penalty of life imprisonment. *See* Or. Rev. Stat. § 163.115(5). As noted above, the government agrees that the jury will be instructed on the state-law charges. As such, there is no danger that the Court – rather than the jury – will decide any fact that increases the prescribed statutory maximum. Further, the Court finds that the Notice of Special Sentencing Factors adequately apprises Garcia of the racketeering activity forming the basis of the special sentencing factor.

### D.     Bill of Particulars

The Court will also deny Garcia's alternative request for a bill of particulars. A bill of particulars serves three purposes: "to apprise the defendant of the specific charges being presented so as to minimize surprise at trial, to aid the defendant in preparing for

trial, and to protect against double jeopardy." *United States v. Burt,* 765 F.2d 1364, 1367 (9th Cir. 1985).

The Court cannot see a need for a bill of particulars here. The 34-page indictment allows Garcia to understand the charges against him. Each count at issue (One, Four, Five, and Six) states the controlling statute, the relevant dates, and the facts supporting the charge. As discussed earlier, Count One – conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d) – describes the history, purpose and operations of BMC. It alleges that defendants were members of this alleged criminal enterprise. It also alleges 71 overt acts in furtherance of the conspiracy. Similarly, the VICAR counts (Four, Five, and Six) sufficiently allege the elements of the charge and the dates on which they allegedly occurred. They further detail the Oregon state statutes that were allegedly violated.

In addition to this, the government represents that it has provided 14,783 pages of discovery, 1,524 pages of photographs, and 34 CDs containing 660 audio recordings and 23 video recordings. This discovery includes, according to the government, "police reports . . . reports of witness statements, statements by the defendants and their co-conspirators, video and audio recordings created by law enforcement and confidential informants, letters written by and to members and associates of the enterprise, audio recordings of conversations between members and associates of the enterprise, forensic testing of physical evidence and crime scenes, prison and jail records, transcripts of court proceedings, and grand jury material." *Response,* Dkt. 257, at 24-25.

Garcia contends that the government should provide still more detail regarding the offenses he allegedly committed in aid of racketeering – "information as basic as the specific criminal charge, his alleged *mens rea*, and the circumstances surrounding the incident." *Reply,* Dkt. 271, at 6. For the reasons discussed earlier in this decision, however, the Court has concluded that the indictment sufficiently notifies Garcia of the charges he will face at trial. The Court is not convinced that Garcia needs further information to prepare for trial, minimize any surprise at trial, or protect against double jeopardy.

**4.      Garcia's Motion to Dismiss Counts Five and Six (Dkt. 238)**

Garcia invokes the collateral-estoppel doctrine in asking the Court to (1) dismiss Counts Five and Six, and (2) strike the Notice of Special Sentencing Factors related to Count One. As will be explained, the collateral estoppel-doctrine does not apply here.

Counts Five and Six, as well as the Notice of Special Sentencing Factors, arise from an August 23, 2008 gunfight where Rudy Mata was killed, and his brother Gonzalo was injured (identified as R.M. and G.M. in the indictment). The State of Oregon charged Garcia with, among other things, murder and attempted murder. In January 2009, Garcia pled guilty to first degree manslaughter (as to Rudy) and first degree assault (as to Gonzalo). All remaining state charges were dismissed.

Roughly two years later, based on the same events, a federal grand jury indicted Garcia with murder in aid of racketeering (related to Rudy Mata; Count Five) and attempted murder in aid of racketeering (related to Gonzalo Mata; Count Six).

Additionally, the indictment notified Garcia of special sentencing factors as to Count One because Garcia allegedly caused Rudy's death "knowingly and intentionally." *Indictment*, at 26. Garcia contends that the government is collaterally estopped from charging these federal crimes based on the shooting that formed the basis of his guilty pleas in state court. As will be explained, however, the dual-sovereignty doctrine permits successive prosecutions.

Collateral estoppel is "embodied" in the Fifth Amendment guarantee against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 445 (1970). But the double jeopardy-clause – and, therefore, the collateral-estoppel doctrine – is inapplicable when two different sovereigns prosecute the same criminal act. *See Heath v. Alabama*, 474 U.S. 82 (1985). This principle is known as the dual-sovereignty doctrine. The central concept underlying this doctrine is that "two identical offenses are not the 'same offence' within the meaning of the Double Jeopardy Clause if they are prosecuted by two different sovereigns." *Id.* at 92. Rather, "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" *Id.* at 88.

Here, Garcia's conduct allegedly violated the laws of Oregon and the United States. Successive prosecutions – one by the State of Oregon and one by the United States – are therefore permissible.

The Ninth Circuit recognizes at least one exception to the dual-sovereignty doctrine, based on dicta in *Bartkus v. Illinois*, 359 U.S. 121 (1959). *See United States v.*

*Zone,* 403 F.3d 1101 (9th Cir. 2005) (adopting the "*Bartkus* exception"). Under the *Bartkus* exception, if "federal authorities commander a state's prosecutorial machinery, converting the state prosecution into 'a sham and a cover for a federal prosecution,'" then there cannot be a subsequent federal prosecution. *Id.* at 1104 (citation omitted).

To the extent Garcia is arguing the *Bartkus* exception applies, the Court is not persuaded. Nowhere does Garcia assert that the federal authorities commandeered Oregon's prosecutorial machinery in the state prosecution. At one point in his brief, Garcia cites a press release, which refers to state and federal authorities' "ongoing" investigation into BMC. *See Reply,* Dkt. 278, at 3. But a cooperative federal-state investigation, standing alone, does not amount to a sham state prosecution. *Cf. Zone,* 403 F.3d at 1105 ("to the extent Zone's motion to dismiss alleges only collaboration between state and federal authorities, it fails to state a colorable double jeopardy claim"). Rather, Garcia must produce "evidence that 'the state in bringing its prosecution was merely a tool of the federal authorities.'" *Id.* at 1103 (quoting *Bartkus*, 359 U.S. at 123). He has not done this.

Finally, Garcia argues that any reliance on the dual-sovereignty or double-jeopardy doctrines is misplaced. He says the "legal analysis for collateral estoppel purposes remains distinct." *Reply*, Dkt. 278, at 4. But it makes no sense to focus exclusively on the collateral-estoppel doctrine to the exclusion of the double-jeopardy clause and the dual-sovereignty doctrine. As already discussed, these concepts must be

analyzed together in criminal prosecutions.[7] *Cf. United States v. Angleton,* 221 F. Supp. 2d 696, 728 (S.D. Tex. 2002) (observing that "most of the courts that have considered collateral estoppel in successive prosecutions by separate sovereigns have applied the standards of the dual sovereignty doctrine and its exception") (citing cases). The Court will therefore deny Garcia's Motion to Dismiss Counts Five and Six and to Strike the Notice of Special Sentencing Factors.

**5.      Garcia's Motion to Dismiss Count Four and For an In Limine Order (Breach of Chain of Custody) (Dkt. 225)[8]**

Garcia next moves for an in limine order preventing the jury from becoming aware that Garcia "possessed or is otherwise associated with a Hi-Point 9 mm handgun" that was allegedly involved in a July 15, 2006 drive-by shooting. This shooting forms the basis of Count Four, attempted murder in aid of racketeering, and Garcia also moves for dismissal of this count.

An officer with the Oregon Police Department seized the gun on July 20, 2006, and ballistic tests were performed shortly thereafter. According to the government, test results showed that the gun was a match to the one used in the July 15, 2006 drive-by shooting. In February 2008, Oregon returned the gun to its rightful owner – third party John Turvey. Turvey later sold the gun to Charles Woods, and Woods allowed the government to take the gun back in January 2012. Garcia says the discovery materials

---

[7] The secondary source Garcia cites recognizes that "[t]he dual sovereignty doctrine is an exception to the collateral estoppel doctrine." *Double Jeopardy*, 37 Geo. L.J. Ann. Rev. Crim. Proc. 435, 461 (2008).

[8] The Court will separately rule on the suppression motion. *See* Dkt. 228.

provided to him do not indicate how the gun was handled and stored, or whether it was cleaned or fired during the nearly four-year period Turvey or Woods had the gun. In any event, after retrieving the gun from Woods in January 2012, the government decided to perform additional tests on it.

Garcia argues that Count Four should be dismissed or, alternatively, that the government should be prohibited from offering the gun into evidence, or even mentioning the gun, for four reasons: (1) the government did not disclose the 2006 ballistics report until early June 2012; (2) the government is conducting additional tests on the gun and had not yet produced the test results to Garcia; (3) the government caused a "significant" break in the chain of custody; and (4) in any event, Garcia can no longer reliably test the gun. *See Reply*, Dkt. 272, at 3-4.

The Court presumes that the first two points – disclosure of the 2006 ballistics testing and additional government testing – are moot. Over six months have passed since the parties briefed this motion. In the intervening period – at Garcia's request – the Court postponed the September 18, 2012 trial to February 12, 2013. *See* Dkt. 297. In seeking this continuance (which the government did not oppose), Garcia represented that "discovery and investigation of this case is complicated by the fact that Mr. Garcia is charged with crimes that are alleged to have occurred in 2006 and 2008 and investigated largely by local law enforcement in Oregon." *Mot.*, Dkt. 295. Given the additional six months to prepare for trial, it seems likely that Garcia has had ample time to consider the

government's ballistic test reports, and to test the gun himself.[9]

Garcia next argues that his motions should be granted because of a break in the chain of custody. Relatedly, he suggests that he will be unable to reliably test the gun anyway because the gun was in someone else's hands for nearly four years.

The ultimate key to this argument is whether a reasonable juror will be able to conclude that the gun is in "substantially the same condition" as it was when it was seized in 2006. At trial, the government will have to authenticate the gun. Generally, evidence is authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). If the evidence is an object connected with the commission of a crime, the proponent must also establish the chain of custody. *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960). If there is a break in custody, the prosecution must introduce sufficient proof such that a reasonable juror could find the items are in "substantially the same condition" as when they were seized. *Id.; cf. also, e.g. United States v. Combs,* 369 U.S. 925 (6th Cir. 2004) (district court properly admitted gun into evidence that had been returned to its owner before the government got it back for trial). The district court may admit the evidence if there is a "reasonable probability the article has not been changed in important respects." *Gallego,* 276 F.2d at 917*; see also, e.g., United States v. Solorio,* 669 F.3d 943, 954 n.13 (9th Cir. 2012).

---

[9] In May 2012, when the government filed its response brief, it said it had custody of the gun and would make it available to Garcia. If Garcia contends he is still prejudiced by late disclosure of reports – despite the continued trial date – he may file another motion.

The parties' arguments on this point are not developed. Garcia says – without explanation or support – that it would be impossible for him to conduct his own ballistics tests on the gun because, among other things, the owners handled the gun and "likely" fired or cleaned it. *See e.g., Mot. Mem.,* Dkt. 225-1, at 5 ("The handling, firing or cleaning of this firearm all prevent Mr. Garcia from performing his own independent ballistics comparison . . . ."). So Garcia's argument is based on the possibility that the gun may have been altered in some significant respect. The government, however, does not represent that the gun is in "substantially the same" condition, or offer any evidence in that regard. Instead, the government says only that it should have the opportunity to offer proof that the gun has not substantially changed.

Given this state of the evidence, the Court will deny Garcia's motion without prejudice. Until there is some further explanation as to the gun's condition, or a more specific explanation as to why it will be impossible for the government to establish that the gun is in substantially the same condition, the Court is not in a position to decide the issue.

**6.      Motion to Strike Surplusage (Dkt. 227)**

Garcia also moves, under Federal Rule of Criminal Procedure 7(d),[10] to strike paragraphs 20(i) and 20 (jjj) of the indictment. The purpose of a Rule 7(d) motion to strike is "to protect a defendant against 'prejudicial or inflammatory allegations that are neither relevant not material to the charges.'" *United States v. Terrigno*, 838 F.2d 371,

---

[10] Federal Rule of Criminal Procedure 7(d) provides: "Upon defendant's motion, the court may strike surplusage from the indictment or information."

373 (9th Cir. 1988) (citation omitted). Thus, to prevail on this motion, Garcia must make two showings. First, he must show that the contested parts of the indictment are irrelevant to the charged crimes. Second, he must also show that the challenged language is unfairly prejudicial or inflammatory.

Garcia has not satisfied this standard. Paragraphs 20(i) and (jjj) are relevant to the charged conduct as follows:

**Paragraph 20(i)**. Paragraph 20(i) alleges that on November 5, 2006, Garcia and others "possessed methamphetamine, five firearms, and stolen property at their residence in Nyssa, Oregon." The government alleges, and hopes to prove, that drugs, guns, and stolen property played a significant role in the alleged conspiracy. Paragraph 17 alleges that as part of the conspiracy, Garcia and other BMC members would "purchase maintain and circulate a collection of firearms for use in criminal activity by BMC." *Indictment* ¶ 17. Paragraph 16 alleges that part of the conspiracy included planning and agreeing upon "the commission of future crimes, including . . . distribution of controlled substances [and] the sale of firearms and stolen property." *Id.* ¶ 16. Granted, drug possession is not drug distribution. But the government rightly points out that possessing a drug is a necessary step to distributing it, and is a material and relevant part of the alleged conspiracy.

**Paragraph 20(jjj).** Paragraph 20(jjj) alleges that on July 1, 2009, Garcia "sent a letter to Adam Gomez a/k/a 'Lil Toro' describing the murder of BMC member R.M. and the aggravated assault of BMC member G.M. and discussing the location of an

incarcerated member of a rival gang."[11]  The letter allegedly discusses the murder and

attempted murder that is the basis for Counts Five and Six.  Further, paragraph 18 alleges

that, as part of the conspiracy, BMC members "agreed that acts of violence, including

murder, attempted murder, and assault, would be committed by members and associates

of BMC against rival gang members, and to impose discipline within BMC itself, and on

other occasions as deemed necessary to promote a climate of fear in order to enforce the

authority of BMC."

Viewing all these allegations together, the government has connected Garcia's

acts, as alleged in paragraphs 20(i) and (jjj), to the charged offenses.  The Court is not

persuaded by Garcia's argument that the overt acts alleged in paragraphs 20(i) and (jjj)

are alleged "in a vacuum alongside a range of disparate other overt acts . . . ."  *Reply,*

Dkt. 274, at 2.  Granted, the government will have to prove its theory at trial, but if the

charged acts are something the government hopes to properly prove at trial, then the

language charging these acts cannot be considered surplusage.  *See, e.g., United States v.*

*Laurienti,* 611 F.3d 530 (9th Cir. 2010); *accord United States v. Thomas*, 875 F. 2d 559,

562 n.2 (6th Cir. 1989) ("if the language in the indictment is information which the

---

[11] Garcia says "there is no guarantee" this letter will be admissible at trial.  *See Mot. Mem.,* Dkt.
227-1, at 7.  On a Rule 7(d) motion, the Court is mainly concerned with the two factors noted
above – relevance and prejudice.  Note, however, that at least one circuit has observed that "'if
evidence of the allegation is *admissible and relevant* to the charge, then regardless of how
prejudicial the language is, it may not be stricken.'"  *United States v. Scarpa,* 913 F.2d 993, 1013
(2d Cir. 1990) (emphasis added; citation omitted).  But here, Garcia did not put the admissibility
issue squarely before the Court.  He just suggested the letter might not be admissible and did not
respond to the government's assertion that it will be admissible under Federal Rule of Evidence
801(d)(2).  Accordingly, the Court will focus on relevance and prejudice.

government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant).").

**7.      Garcia's Motion to Dismiss (Venue) (Dkt. 234)**

Finally, Garcia moves to dismiss all counts against him for lack of venue.

Two Constitutional provisions limit where criminal defendants can be tried.  First, Article III requires that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3.  Second, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."  These constitutional commands are codified in Federal Rule of Civil Procedure 18, which provides that "prosecution shall be had in a district in which the offense was committed."

**A.      Count One**

As for Count One, the conspiracy charge, "[i]t is by now well settled that venue on a conspiracy charge is proper where the conspiracy was formed or where any overt act committed in furtherance of the conspiracy occurred."  *United States v. Gonzalez,* 683 F.3d 1221, 1224 (9th Cir. 2012).  It is not necessary that Garcia ever set foot in Idaho so long as a co-conspirator committed an overt act within the district.  *See United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994) ("Although [the defendant] never set foot there, Nevada was a proper venue for the conspiracy charge (count one) because it was the site of the initial agreement and subsequent phone calls [by the defendant's coconspirators]

planning the drug transaction.").

The indictment alleges that numerous overt acts in furtherance of the conspiracy occurred in Idaho.  Venue on this charge is therefore proper in Idaho.

### B.    Counts Four, Five, and Six

Venue is also proper in Idaho for Counts Four, Five, and Six.  These counts charge Garcia with committing violent crimes in aid of racketeering (VICAR), in violation of 18 U.S.C. § 1959(a).  Deciding precisely where an offense is committed can be difficult in cases where "the acts constituting the crime extend over a period of time, and occur in widely different localities."  *United States v. Saavedra*, 223 F.3d 85, 89 (2d Cir. 2000).  For these offenses – aptly called "continuing offenses" – venue is proper "in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  The question here, then, is whether the violent crimes in aid of racketeering Garcia is charged with (murder and attempted murder) are continuing offenses.  To answer the question, this Court must first "identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts."  *United States v. Rodriguez-Moreno*, 526 U.S.275, 279 (1999).

The first step is straightforward.  The elements of a violent crime in aid of racketeering are:  "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise."  *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008).

The next step is deciding where Garcia committed the "criminal acts."  The

indictment alleges that the physical killing (or attempted killings) took place in Oregon.

But it also charges that an essential conduct element occurred in Idaho.  Specifically, the

indictment alleged that "in the Districts of Idaho and Oregon" Garcia did "aid, abet,

counsel, command, induce and procure" the murder or attempted murders.  *Indictment,*

*Count Four,* at 28 (attempted murder of "C.C., A.C., H.C., I.C., and others"); *id.*, *Count*

*Five*, (murder of R.M.); *id.* at 29 (attempted murder of G.M.).  On a pre-trial motion to

dismiss for lack of venue, the Court presumes the truth of these allegations.  *See United*

*States v. Jensen,* 93 F.3d 667, 669 (9th Cir. 1996).  Venue is therefore proper in the

District of Idaho.

The Ninth Circuit ruled on a similar indictment in *United States v. Stinson*, 647

F.3d 1196, 1204 (9th Cir. 2011).  The *Stinson* indictment alleged that physical killings

occurred in the Northern District of California, but also charged the defendant with

aiding, abetting, advising, encouraging, and otherwise participating in the murders within

the Central District of California.  *Id.* at 1204.  Based on these allegations, the court

concluded that same crime charged here – committing a violent crime in aid of

racketeering – was a continuing offense and properly venued in the Central District.  *Id.*

Garcia says *Stinson* is distinguishable because this indictment "makes clear that all

of the acts underlying Counts Four, Five and Six (the VICAR Counts), occurred in

Oregon and not the district of Idaho.  Mr. Garcia is not alleged to be a leader of the BMC

gang or alleged to have conducted any of the essential conduct elements underlying these

counts in Idaho. Instead, it is alleged he committed the acts charged in these counts in Oregon." *Mot. Memo.*, Dkt. 234-1, at 5. This argument, however, overlooks the above-quoted part of the indictment, which alleges that Garcia aided, abetted, counseled, commanded, induced and procured the murders and attempted murders in both Oregon and Idaho. The Court will therefore deny the motion to dismiss for lack of venue.

## ORDER

**IT IS ORDERED THAT**

1. Defendant Oscar Garcia's Motion to Dismiss Count One (Dkt. No. 223), which defendant Jimenez joined (Dkt. 235), is **DENIED**.

2. Defendant Oscar Garcia's Motion to Dismiss Counts One, Four, Five, and Six or, in the Alternative, for a Bill of Particulars (Dkt. 224) is **DENIED.**

3. Defendant Oscar Garcia's Motion to Dismiss Count Four and For Order in Limine (Dkt. 225) is **DENIED WITHOUT PREJUDICE.**

4. Defendant Oscar Garcia's Motion to Strike Surplusage (Dkt. No. 227) is **DENIED.**

5. Defendant Amando Torres-Garcia Jr.'s Motion to Dismiss (Dkt. 230), which Oscar Garcia and Jimenez joined (Dkt. 235, 241), is **DENIED.**

6. Defendant Oscar Garcia's Motion to Dismiss for Lack of Venue (Dkt. 234) is **DENIED**

7. Defendant Oscar Garcia's Motion to Dismiss Counts Five and Six and to Strike Notice of Special Sentencing Factors (Dkt. 238), is **DENIED.**

8. The Court **GRANTS** the joinder motions described above (Dkts. 235, 241) to the extent the moving defendant ask to join the underlying motions. As noted, however, the underlying motions have been denied.

9. Defendant Amando Torres -Garcia Jr.'s pending motions – for joinder (Dkts. 233, 245) and to suppress certain statements (Dkt. 242) – are **MOOT.**

**SO ORDERED.**

DATED: December 19, 2012

Edward J. Lodge
United States District Judge