UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>v.<br><br>OSCAR GARCIA,<br><br>                Defendant. | Case No: 1:11-cr-0068-EJL<br><br>**MEMORANDUM DECISION AND ORDER RE MOTION TO SUPPRESS** |

## INTRODUCTION

The Court has before it defendant Oscar Garcia's motion to suppress (Dkt. 228). After reviewing all the materials presented in the memoranda and at the evidentiary hearing, the Court now issues its decision. For the reasons explained below, the Court will deny the motion.

## FACTS

On July 20, 2006, at around four in the morning, Police Officer Sam Almaraz saw a white four-door Pontiac in the parking lot of a Moxie Java coffee shop in Ontario, Oregon. Officer Almaraz decided to see why the car was there and pulled into the lot.

MEMORANDUM DECISION AND ORDER - 1

The Pontiac started to exit the lot when police car pulled in. Officer Almaraz did not activate his lights or siren or make any hand gestures ordering the Pontiac to stop; he just "cruise[d] in there slowly and started rolling down [his] . . . window . . . ." *Hearing Transcript,* Dkt. 325-1, at 10:21-22. The Pontiac approached the police car, stopped, and the driver rolled down his window as well.

Officer Almaraz asked the driver (later identified as Martin Ortega) what they were doing there. Ortega said he was visiting friends, but he appeared nervous and would not maintain eye contact. Officer Almaraz asked who the friend was. Ortega "appeared nervous and he didn't provide a name . . . he just stuttered and then stuttered no names, 'Just Friends.'" *Id.* at 11:17-22. The officer then asked for identification and Ortega produced his driver's license.

Office Almaraz recognized the front-seat passenger, Luis Rodriguez, as his cousin's grandson. Almaraz knew Rodriguez had been associating with a particularly violent gang – the Eastside BMC gang. Almaraz also noticed a backseat passenger, who identified himself as Oscar Garcia – the defendant in this case. Almaraz knew Garcia was an Eastside BMC gang member.

At this point – roughly two minutes after both cars stopped – a couple things happened. First, a second officer arrived as backup; he parked his patrol car behind Almaraz's. Second, Officer Almaraz asked Ortega if he would get out of the car and speak to him "in private away from the car." *Id.* at 17:7-8. Ortega got out of the car and Almaraz pat searched him and asked "basically the same thing as" as before – "just

asking what they were doing at the business at that hour." *Id.* at 17:17-18. Almaraz also asked him "if there was anything illegal in the car as far as weapons or anything – any items illegal." *Id.* at 17:16-21. Almaraz then pat searched and questioned Garcia. The same drill followed for Rodriguez.

After pat searching and individually questioning all three men, Officer Almaraz asked Ortega to produce his registration and proof of insurance. Ortega got in the car to retrieve these items. While he was inside the car, Officer Almaraz again asked if he could search the car. Ortega moved things around to show he had nothing to hide. *Transcript*, at 55:8-12; *Mot. Mem.*, Dkt. 228-1, at 3. Officer Almaraz asked Ortega if he could search the car himself and Ortega consented. He discovered a 9 mm handgun under the front passenger seat. Officer Almaraz told Officer Snyder to arrest Rodriguez and Garcia. Garcia fled on foot but was caught. All three were charged with possession of a firearm.

## ANALYSIS

The Fourth Amendment gives all citizens the right "to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. A warrantless search is presumptively unreasonable unless it falls within one of the established exceptions to the warrant requirement. *See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 372 (1993). The government has the burden of persuading the Court that one of these exceptions applies. *United States v. Huguez–Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992).

The government argues that the occupants in Martin Ortega's car were never seized because the entire encounter was consensual and that a reasonable person in their shoes would have felt free to terminate the encounter and leave at any time. Alternatively, the government argues that if the encounter escalated into a seizure, it was lawful because Officer Almaraz reasonably suspected criminal activity was afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968).

**A.     Seizure**

The Court will first address whether the encounter was a seizure. The parties' positions are the polar opposite of each other on this point. The government argues that none of the people in the car were seized at any point, while Garcia argues there was a seizure the moment the Pontiac stopped. The Court concludes that the entire encounter was consensual.

**1.  The Initial Encounter**

There was no seizure when Officer Almaraz simply stopped his car, rolled down his window, waited for the Pontiac driver to do the same, and then asked Ortega questions.

A person is seized if "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted). "It is well established, however, that the Fourth Amendment is not implicated when law

enforcement officers merely approach an individual in public and ask him if he is willing to answer questions. No Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen." *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007) (case citations omitted). This applies when an officer approaches a person in a car parked in a public place. *Id.* "Moreover, it is clear that the permissible questions may include a request for consent to search, 'as long as the police do not convey a message that compliance with their requests is required.'" *Id.* (citations omitted).

As noted above, when he first saw the car, Officer Almaraz did not activate his lights or sirens, use any commanding hand gestures, or block the car from driving away. He just pulled in, stopped, waited for the Pontiac to drive up to his car, and then asked the driver what he and the others were doing. A reasonable person at this point would have felt free to terminate the encounter and leave.

### 2. The Rest of the Encounter

Consensual encounters can escalate into seizures. *Washington,* 409 F.3d at 771. This occurs "'when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person,' or 'if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 770-71 (citations omitted). The Ninth Circuit has identified several factors to consider in

determining if a person was seized, any one of which, if present, could constitute a seizure: (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter. *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994).

After considering these factors, the Court concludes that there was no seizure at any point during this encounter.

The first three factors – (1) the number of officers, (2) whether weapons were displayed, and (3) whether the encounter was in a public or private setting – do not weigh heavily either way. First, although the occupants in the vehicle encountered two officers when they stepped out of the car, the second officer was not involved in the questioning. He simply arrived and parked his car behind Officer Almaraz's. (Officer Almaraz did not request backup; either dispatch sent him or he overheard Almaraz's position on the radio and showed up. *See Transcript*, at 49:13-18).

Second, neither officer brandished a weapon. The fact that they were armed does not seem to matter much; a reasonable person would expect a uniformed officer to be carrying a weapon.

As for the third factor, courts are more likely to find seizures in non-public settings. *See United States v. Crapser,* 472 F.3d 1141, 1146-47 (9th Cir. 2007)

(discussing cases). Here, the car was parked in a public parking lot, but it was the middle of the night, so it was a more isolated situation than a typical public setting.

The most compelling factor here is the fourth – the officer's tone and manner. The Court was struck by how mild-mannered this officer was at the hearing and, based on his testimony as well as his demeanor, the Court is convinced that entire encounter was low-key and consensual. Most officers are likely on their best behavior during an evidentiary hearing. But this officer stood out, and the Court found the following testimony credible:

> Q. Were you speaking to them in a voice like you are speaking here today?
>
> A. Yes, sir; I was.
>
> Q. Did you ever get upset?
>
> A. There was no reason to be upset; no, sir.
>
> Q. Did you ever issue any demands?
>
> A. No, sir.
>
> Q. Did you ever issue any orders?
>
> A. No, sir.
>
> Q. Did you ever feel like you needed to put either of these three individuals in their place to make sure they complied with –
>
> A. No, there was no reason to give any commands; everybody was cooperating at that point.

*Transcript*, 25:12 to 26:1.

By contrast, the Court found Garcia less credible when he testified that Officer Almaraz "directed" him out of the car. *See Transcript,* at 62:11-22. (None of the other

occupants in the vehicle testified at the hearing.) Rather, based on Officer Almaraz's testimony regarding the entire encounter, the Court does not believe the officer directed the occupants of the vehicle to do anything. He asked.[1] It is also notable that Garcia's testimony was extremely limited; he did not, for example, say he did not feel free to terminate the encounter. Nor did he provide any more general testimony about the overall nature of the encounter. This contrasts sharply with Officer Almaraz's extensive testimony regarding the overall cooperative nature of the encounter.

Additionally, there is nothing to indicate that Officer Almaraz implied he would force Garcia and the others to comply with his requests, or that the situation was a tense one. Just the opposite. Not only is Almaraz mild-mannered himself, but one of the people in the car (Rodriguez, the front-seat passenger) was his relative. It is logical to assume that a police officer is less likely to adopt an authoritarian attitude when a relative is present. Additionally, Officer Almaraz and all the young men are Hispanic, so racial tensions that have factored into whether a defendant acted voluntarily are not present here. *See, e.g., Washington*, 490 F.3d at 776 ("tension between the African-American community and police officers in Portland" a factor in determining that defendant did not voluntarily consent to search of car).

---

[1] During the hearing, defense counsel often would phrase questions with the word "direct" in them. On many occasions, the officer clarified that he asked, rather than directed. *See, e.g.,* Transcript, at 54:23 to 551. At other times, however, the officer simply answered the question, not clarifying that he *asked* rather than directed. This exchange is one example: "Q. You directed the driver of the vehicle, Mr. Ortega, to produce his driver's license and he did that; correct? A. That is correct." Transcript, at 45:3-6. On balance, the Court believes Officer Almaraz asked, rather than directed. In particular, the Court finds it instructive that when the officer was asked specifically whether he asked or directed the driver to retrieve paperwork from the car, he clarified that he asked. *See Transcript,* at 54:25 to 55:3.

**MEMORANDUM DECISION AND ORDER - 8**

The final factor weighs in the Garcia's favor because Officer Almaraz never told Garcia or the others they were free to terminate the encounter, even after Garcia complained that he felt as though they were being harassed. *Transcript,* at 19:24 to 20:8. But despite this, the Court concludes that a reasonable person in Garcia or his companions' position would have felt free to terminate the encounter. Preliminarily, the Court does not believe the officer was acting in a harassing manner. So although Garcia used this term, the record does not support that they were actually being harassed. More importantly, however, the Court does not believe Officer Almaraz did anything other than ask questions and explain why he was asking questions. Garcia decided to voluntarily answer these questions rather than terminate the encounter.

Because the entire encounter was consensual – including the search of the Pontiac – the Court will deny Garcia's suppression motion. As explained below, however, even if the encounter escalated into a seizure, Officer Almaraz reasonably suspected the occupants in the Pontiac had committed, or were about to commit, a crime.

**B.     Reasonable Suspicion**

A *Terry* stop requires only reasonable suspicion that the detainee is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio,* 392 U.S. 1, 20-21 (1968). When determining whether a Terry stop was supported by reasonable suspicion, the Court does not separately scrutinize each factor relied upon by the officer.

*See United States v. Sokolow*, 490 U.S. 1, 8-9 (1989). Rather, the Court considers the totality of the circumstances as the officer on the scene experienced them. One court described it this way:

> One cannot parse out each individual factor, categorize it as potentially innocent, and reject it. Instead, one must look at all of the factors . . . and examine them collectively. There is a gestalt to the totality of the circumstances test . . . .

*State v. O'Meara*, 9 P.3d 325, 327 (Ariz. 2000).

Additionally, police officers' training and experiences enable them to "draw[] inferences and make[] deductions" from seemingly innocuous facts – "inferences and deductions that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

In this case, the following factors, when considered in their totality, establish Officer Almaraz's reasonable suspicion that the occupants in the white Pontiac were engaging in criminal activity: (1) the Pontiac was parked in the lot of a closed establishment – a Moxie Java coffee shop – at around 4:00 in the morning; (2) there had been complaints of burglaries, thefts and gang-related issues "in the general area," *Transcript,* at 7:5-9; (3) the Pontiac started to leave the lot when the officer began pulling in; (4) the driver acted nervous and did not maintain eye contact with Officer Almaraz; (5) the driver did not give the name of the friend he said he was visiting; and (6) within the first two minutes after the Pontiac stopped, Officer Almaraz realized that two gang members or affiliates were in the car.

Although these factors must be considered in their totality, it still makes sense to examine each factor individually before considering them together to see whether they amount to reasonable suspicion.

*Car Parked in the Lot of a Closed Business*

As for the first factor, the fact that the Pontiac was parked in the lot of closed establishment can strongly contribute to an officer's reasonable suspicion. The Court does not view the parked-car scenario by itself as sufficient to justify a *Terry* stop, but it certainly is a significant factor in the overall reasonable-suspicion calculus. *See generally United States v. Edmonds*, 240 F.3d 55 (D.C. Cir. 2001) (rejecting Eighth Circuit's suggestion in *United States v. Dawdy*, 46 F.3d 1427 (8th Cir. 1995) "that the parked car scenario *by itself* [is] sufficient to justify a *Terry* stop")). The defendant has pointed out that the Moxie Java coffee shop is located on a block that is probably best described as mixed-use; it is about half business and half residences. But still, at 4:00 in the morning, a car that is parked near a closed business (and not more directly adjacent to a residence) can logically contribute an officer's reasonable suspicion.

*Criminal Activity in "The General Area"*

At the hearing, Officer Almaraz testified that "in neighborhood" or "the general area" where the Moxie Java was located, there had been "a lot of gang-related issues, and burglaries, and theft throughout the year." *Hearing Transcript,* at 7. The fact that a given locale is well known for criminal activity will not, standing alone, justify a *Terry*

stop, but it is among the various factors the officer may take into account. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

### *Car Starts to Leave as the Officer Pulls In*

The next factor – that that the Pontiac started to leave the lot as the officer pulled in – is tempered by the fact that Ortega voluntarily stopped the car without any prompting by the officer.

### *Nervousness & the "Just Friends" Answer*

The fact that Ortega was nervous when questioned by the officer, standing alone, is not enough to cause an officer to reasonably suspect that criminal activity is afoot. *See, e.g., United States v. Chavez-Valenzuela,* 268 F.3d 719, 726 (9th Cir. 2001), *amended* 279 F.3d 1062, *overruled on other grounds by Muehler v. Mena,* 544 U.S. 93 (2005). As the Ninth Circuit has explained, "[e]ncounters with police officers are necessarily stressful for law-abiders and criminals alike." *Id.* Thus nervousness – even "extreme nervousness" – "in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity . . . ." *Id.* In this case, Officer Almaraz indicated that Ortega not only was nervous, but that that he would not maintain eye contact and could not even tell him the first name of the "friends" he said he had been visiting.

### *Gang Member and Affiliate*

Finally, within two minutes of stopping the car, Officer Almaraz realized that the two passengers were gang members or affiliates. The fact that someone is a gang

member – standing on its own – is not enough to support reasonable suspicion. *See United States v. Mendez,* 467 F.3d 1162 (9th Cir. 2006), *withdrawn,* 476 F.3d 1077 (9th Cir. 2007).[2] But, as with all the other factors, officers can include gang membership in the overall reasonable-suspicion calculus. *Id.*

### *The Totality of the Circumstances*

When considering all the above factors in their totality the Court concludes the *Terry* stop was justified by reasonable suspicion. As indicated, none of the factors, standing alone, is enough. And there is nothing illegal about being in a parking lot of a closed business at 4:00 in the morning with gang members or affiliates. Nor is it illegal to be nervous or refuse to tell the police the name of the friend you said you were visiting. But reasonable suspicion of criminal activity may be formed by observing purely legal activity.

*Terry* itself is a good example of how seemingly innocent actions (looking in a store window, talking to someone, and walking around) led a police officer to reasonably suspect that two men were "'casing a job, a stick up.'" *See Terry v. Ohio,* 392 U.S. 1, 6 (1968). As the Court explained:

---

[2] The 2006 *Mendez* opinion was withdrawn, but it is nonetheless useful here. The Ninth Circuit withdrew its 2006 opinion after a petition for rehearing. In the first round, the government did not point out that if an underlying traffic stop is lawful, the police do not need reasonable suspicion to support expanded questioning – so long as the questioning does not improperly prolong the traffic stop. *See Mendez,* 476 F.3d 1077 (9th Cir. 2007). The first *Mendez* opinion wrongly assumed that the officers needed to justify their questioning with reasonable suspicion. That was not so, because the defendant conceded the legality of the traffic stop. But here, there is no underlying, lawful traffic stop, so Officer Almaraz must have had reasonable suspicion to question the defendants. Thus, the first *Mendez* opinion is instructive.

> There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away.

*Id*. at 22–23

And so it is here. In this case, when all the above factors are considered together, Officer Almaraz reasonably suspected that criminal activity was afoot. He was therefore justified in detaining the individuals for questioning. Similarly, given the circumstances, Officer Almaraz reasonably suspected that Garcia and the others might be armed and was justified in conducting a pat-search for weapons.

For all these reasons, the Court will deny Garcia's Motion to Suppress.

## ORDER

**IT IS ORDERED THAT** Defendant's Motion to Suppress (Dkt. No. 228) is **DENIED.**

SO ORDERED.

DATED: January 7, 2013

Edward J. Lodge
United States District Judge